# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INCLUSIV, INC.,<br>39 Broadway, Suite 2140<br>New York, New York 10006<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>    and<br><br>LEE ZELDIN, in his official capacity as<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>    and<br><br>W.C. MCINTOSH, in his official capacity as<br>ACTING DEPUTY ADMINISTRATOR,<br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>    and<br><br>CITIBANK, N.A.,<br>5900 South Corporate Place<br>Sioux Falls, South Dakota 57108<br><br>        Defendants. | Civil Action<br>No. 1:25-cv-00948 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      In passing the Inflation Reduction Act of 2022, Congress established the Greenhouse Gas Reduction Fund (GGRF), a nearly $27 billion fund supporting clean energy, energy efficiency, and pollution reduction. The GGRF provides competitive grants under three programs: the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and the Solar for All program. GGRF funds under the NCIF and the CCIA programs are held by Citibank in a ministerial capacity and distributed to grantees on-demand.[1]

2.      This action stems from the Environmental Protection Agency's (EPA's)[2] unlawful February 2025 freeze of GGRF funds and March 2025 attempted revocation of GGRF grants. Those actions have no basis in the law. By unilaterally terminating a program created by Congress, EPA overstepped its authority and violated multiple regulations, statutes, and constitutional provisions.

3.      Inclusiv, Inc., is a 50-year-old nonprofit with an unmatched track record promoting financial security and independence through our nation's credit unions. As the first financial intermediary for Community Development Financial Institutions, Inclusiv received an award through the CCIA program in 2024. Relying on its award, Inclusiv made commitments to 108 credit unions in its first round of subawards.

---

[1] References to GGRF throughout this complaint denote grants under the NCIF and CCIA programs only, and do not include funds granted under Solar for All.

[2] EPA's actions as described in this Complaint were made at the direction and authorization of Administrator Lee Zeldin and Acting Deputy Administrator W.C. McIntosh. These defendants will be referred to collectively as "EPA Defendants."

These subrecipients' CCIA projects will help low- and moderate-income communities reduce energy costs, create jobs, and improve financial security.

4.    Inclusiv's initial commitment of subawards to 108 credit unions is just the first part of Inclusiv's plan to distribute its CCIA funds to communities in need. Under its EPA-approved workplan, Inclusiv plans to select up to 400 credit unions to receive $1.683 billion in subawards by June 30, 2030. Inclusiv and its members thus have a vested interest in enjoining EPA's unlawful action and maintaining the GGRF program. To remedy EPA's obstructionism and Citibank's unlawful retention of the GGRF funds, Inclusiv respectfully requests the relief as prayed for below.

## JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction over Inclusiv's claims against EPA Defendants pursuant to 28 U.S.C. § 1331 because these claims arise under the United States Constitution and federal law, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

6.    This Court has jurisdiction to determine whether a federal agency and federal officers are acting *ultra vires*, and the Court has inherent equitable authority to adjudicate constitutional claims.

7.    This Court has jurisdiction over Inclusiv's claims against Defendant Citibank pursuant to 28 U.S.C. § 1332 because Inclusiv and Citibank are of diverse citizenship, and the amount in controversy exceeds $75,000. The Court also has jurisdiction pursuant to 28 U.S.C. § 1367 because Inclusiv's claims against Citibank

are sufficiently related to its claims against EPA Defendants such that all claims form part of the same case or controversy.

8.    This Court has authority to grant declaratory and injunctive relief under the APA, 5 U.S.C. § 702; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the Court's inherent equitable powers.

9.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because defendants include an officer or employee of an agency of the United States acting in his official capacity and an agency of the United States; and a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia.

## PARTIES

10.    Plaintiff Inclusiv is certified by the U.S. Department of the Treasury as a Community Development Financial Institution (CDFI). For fifty years, Inclusiv has proudly partnered with credit unions to promote financial security and independence for everyday people. Inclusiv was one of eight competitively selected recipients of a GGRF grant award under the Inflation Reduction Act of 2022, receiving $1.87 billion in grant funding. To date, Inclusiv has selected 108 credit unions across the United States and in Puerto Rico as subrecipients of its funds. Those subrecipients will work to reduce energy costs, create good jobs, and increase financial security for consumers.

11.    Defendant EPA is the agency of the federal government of the United States made responsible for administering the GGRF by the Inflation Reduction Act. EPA is an agency within the meaning of the APA.

12.     Defendant Lee Zeldin serves as the EPA Administrator and the agency's highest ranking official. Inclusiv sues Administrator Zeldin in his official capacity.

13.     Defendant W.C. McIntosh is the EPA Acting Deputy Administrator, and the individual who signed EPA's "Notice of Termination" on March 11, 2025. Inclusiv sues Deputy Administrator McIntosh in his official capacity.

14.     Defendant Citibank, N.A. is a national banking association organized and existing under the laws of the United States, including the U.S. National Bank Act. Citibank is headquartered in South Dakota, and is the wholly owned subsidiary of Citigroup, Inc., which is headquartered in New York.

## FACTUAL ALLEGATIONS

### A.    Inclusiv's work supports Community Development Credit Unions

15.     In 1974, Inclusiv was founded as the National Federation of Community Development Credit Unions. From that day on, Inclusiv's mission has always been to promote financial security and independence for everyday people. Today, Inclusiv is a 501(c)(3) nonprofit and remains a nonpolitical and nonpartisan organization.

16.     Inclusiv achieves its mission by working closely with credit unions—not-for-profit financial institutions that are owned by their members and exist to serve specific communities. Inclusiv serves communities of all shapes, sizes, and political affiliations, and partners with credit unions across the United States. The trust of these member credit unions is vital to Inclusiv's work promoting the financial security and independence of people living in underserved communities.

17.    According to the National Credit Union Administration, as of December 31, 2024, there are 4,455 federally insured credit unions that provide direct banking services to 142.3 million Americans and collectively manage $2.31 trillion in assets.

18.    As regulated depositories, credit unions can leverage federal resources to increase local investment and spur economic growth. Credit unions are efficient. An Inclusiv-led study of the U.S. Treasury's 2010 Community Development Capital Initiative determined that, over a five-year period, participating credit unions made $60 in loans for every $1 in Treasury secondary capital investment.

19.    In 1983, Inclusiv launched the nation's first-ever private-sector capitalization program for community development credit unions. The successful campaign for public investment that followed resulted in the creation of the federal Community Development Financial Institution (CDFI) Fund.

20.    Inclusiv has been a federally certified CDFI since 1996, and has a nationwide reach. Indeed, Inclusiv's track record of investing in the community development credit union movement is unparallelled.

21.    By pairing federal funding from the CDFI Fund with private impact capital, Inclusiv has invested a total of $486 million in credit unions nationwide. This total includes $94.7 million in secondary capital (now subordinated debt) invested in high-impact credit unions to support their growth. The total also includes more than $320 million in social impact deposits Inclusiv placed at community development credit unions to expand their lending capacity.

22.    In addition to its substantial monetary investments, Inclusiv manages grant programs that support credit unions' deep impact work. Inclusiv's support has allowed credit unions to originate loans to people who would otherwise be excluded from the financial mainstream. This lending helps first-time homebuyers purchase homes; small businesses expand their local hiring; and homeowners and businesses recover and rebuild after disasters.

23.    Inclusiv's capitalization experience with credit unions is unmatched in breadth, depth, and duration, and includes the creation through regulatory advocacy of secondary capital for credit unions (now subordinated debt). Inclusiv's work has led to the investment of more than $3.4 billion in public and private capital in credit unions, spurring their growth and deepening their impact in communities across the United States and in the U.S. Territories.

24.    In addition to Inclusiv's work as a CDFI, Inclusiv has played a key role in helping the federal government effectively deploy critical federal funding to support high-priority programs. For example, during the first Trump Administration, Inclusiv partnered with leaders at the Small Business Administration to enroll and support community development credit unions in the Paycheck Protection Program (PPP), which helped deliver capital to small businesses during those early days of the COVID-19 pandemic.

25.    As a result of Inclusiv's efforts, community development credit unions responsibly and effectively deployed almost $2 billion in PPP loans within just the first six months of the program, with an average loan size of approximately $27,000.

This funding enabled main street businesses to stay open—preserving jobs and giving business owners the opportunity to pivot their business models to address disruptions stemming from the COVID-19 pandemic.

26.    Inclusiv supported other capitalization efforts during the first Trump administration, including the Emergency Capital Investment Program, an initiative implemented under the Coronavirus Aid, Relief, and Economic Security Act.

27.    Inclusiv established the Center for Resiliency and Clean Energy in 2019, before the conception of the Inflation Reduction Act and GGRF. The Center teamed up with the University of New Hampshire to offer the nation's first program to help community lenders offer affordable clean energy loans. This effort involved obtaining support from the U.S. Department of Energy to design the country's first Solar Lending Training and Technical Assistance Program in the community lending field.

28.    In addition to designing solar lending training and technical assistance programs, Inclusiv has since expanded its training content to include other relevant clean energy and energy efficiency lending topics.

29.    Inclusiv regularly offers training and support to credit unions on other topics and in other areas, enhancing their ability to participate in federal programs and serve their communities. These initiatives have made a tangible impact in the energy arena, helping lenders finance community projects that reduce energy costs, improve energy efficiency, and improve resilience in extreme weather.

30.    Inclusiv's work is entirely bipartisan. Inclusiv has a long history of working with organizations and administrations on both sides of the aisle, and endeavors to continue to do so.

31.    Over five decades of partnership building for grant recipients, credit unions, and leaders in the many communities it serves, Inclusiv has cultivated substantial goodwill with its many stakeholders. It relies on this trust and support in achieving its mission to help low- and moderate-income people and communities achieve financial independence through credit unions.

**B.    Inclusiv applies for a GGRF grant from EPA**

32.    When Congress passed the Inflation Reduction Act of 2022, it created the Greenhouse Gas Reduction Fund (GGRF).

33.    To fund the GGRF, Congress appropriated nearly $27 billion dollars for three grant programs: the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and the Solar for All program.

34.    The basic purpose of the GGRF is to leverage federal grant funds to mobilize private capital in support of clean energy and pollution reduction initiatives. In the NCIF and CCIA programs, EPA accomplishes this through competitive grants to nonprofit entities that (1) are designed to provide financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (2) do not take deposits, other than deposits from repayments and other revenue received from financial assistance provided using grant funds under the program; (3) are funded by

public or charitable contributions; and (4) invest in or finance projects alone or in conjunction with other investors. Inclusiv meets these criteria.

35.     On July 14, 2023, EPA issued a notice of funding opportunity for these grants, which began a competitive grant application process. That notice offered $6 billion in CCIA grants to finance clean energy in low-income and disadvantaged communities, all while building the capacity of lenders that serve those communities.

36.     The CCIA award would allow grantees to provide funding to community lenders to help everyday people gain access to capital to improve energy efficiency, and install clean technology in their homes, businesses, schools, and communities. The EPA's notice of funding opportunity specifically highlighted lenders that Inclusiv has a long history of partnering with and serving—credit unions and CDFIs—as examples of community lenders within the ambit of the program.

37.     Given its history of service to credit unions and CDFIs, and its support for clean energy efforts, Inclusiv was well-positioned to apply for a CCIA grant.

38.     Inclusiv worked for months to prepare its application. That application explained Inclusiv's history of serving credit unions and disadvantaged communities; its work training community lenders to finance clean energy projects; and its vision for furthering its mission with CCIA funds.

39.     The application described Inclusiv's unique ability to leverage its decades-long relationships with credit unions—explaining that Inclusiv would use CCIA funding to support hundreds of credit unions that serve millions of people across the country and manage billions of dollars in assets.

40.    The application also described Inclusiv's plan to ensure transparency and accountability in its use of the grant, as well as Inclusiv's investment strategy. That investment strategy featured clearly defined objectives such as investments in clean energy and air pollution reduction; a tailored approach to deliver benefits that leverage the private capital managed by credit unions; and a strategy to promote local community engagement, which was buttressed by 67 letters of support from national and regional organizations.

41.    In October 2023, Inclusiv submitted its final, 54-page CCIA application to EPA, along with hundreds of pages of supporting documents.

**C.    Inclusiv receives $1.87 billion in grant funding**

42.    In April 2024, EPA announced that Inclusiv was awarded $1.87 billion under the CCIA grant program. Inclusiv was one of five recipients of a CCIA award, and one of eight CCIA and NCIF grant recipients in total.

43.    The Inflation Reduction Act directed that these funds be obligated to grantees, including Inclusiv, by September 30, 2024.

44.    On August 8, 2024, Inclusiv's GGRF grant was memorialized in a notice of award and grant agreement. That grant's period of performance was set for April 1, 2024, to June 20, 2030.

45.    The notice of award described how Inclusiv was to use the award funds: to "provide funding and technical assistance to community lenders who will in turn finance clean technology deployment in low-income and disadvantaged communities

while simultaneously building the capacity of the community lenders to draw on that capital to catalyze deployment of projects in communities across the country."

46.    In the notice of award, EPA also acknowledged Inclusiv's extensive and relevant experience, stating that "Inclusiv is uniquely positioned as a hub nonprofit to enable this vast network of community lenders to finance clean technology projects in building retrofits, transportation, and distributed energy that support affordability and impact in low-income and disadvantaged communities, in perpetuity."

47.    Inclusiv thereafter collaborated with EPA to finalize its Workplan and Budget, ensuring that Inclusiv's program was compliant with all federal regulations, and that Inclusiv could deploy its funding efficiently, with the largest reach, and with careful oversight and accountability.

48.    Inclusiv's EPA-approved Workplan and Budget detailed Inclusiv's plan to leverage its relationships with hundreds of community lenders that had an interest in creating affordable and equitable clean energy loan products for their communities. Many of those lenders had already built knowledge of clean energy financing through Inclusiv's Solar and Green Lending Training and Technical Assistance Program.

**D.    Citibank becomes financial agent for Inclusiv's funds**

49.    Federal law permits the Treasury Secretary to "deposit public money" in a bank such that the bank becomes a "financial agent[] of the Government." 12 U.S.C. § 265. EPA structured the GGRF program in precisely this way, providing

that grant funds would be held and disbursed by an external financial agent rather than the United States Treasury.

50.     This funding mechanism has been in use for almost two centuries, and Democratic and Republican administrations have used financial agency agreements to administer programs supporting millions of Americans, including social security benefits, tax filings, retirement savings, and veterans' benefits.

51.     On September 19, 2024, Citibank and Treasury entered into a Financial Agency Agreement, designating Citibank as the financial agent for all GGRF grants, including the CCIA grant to Inclusiv.

52.     That agreement subjects Citibank to extensive oversight and reporting requirements, allowing the government to supervise how the money is spent.

53.     On November 6, 2024, Inclusiv, Citibank, and EPA entered an Account Control Agreement governing Citibank's disbursement of Inclusiv's grant funds. Once that Agreement took effect, Treasury deposited Inclusiv's GGRF grant funds into Inclusiv's Citibank account.

54.     The Account Control Agreement places Citibank in a ministerial role, responsible for following grantees' instructions regarding the use of their grant funds. Specifically, that agreement obligates Citibank to fully comply with any "instructions, notifications, and entitlement orders" from Inclusiv "directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

12

55.     Citibank's obligation to comply with Inclusiv's instructions continues until such time as Citibank receives a notice of exclusive control from EPA.

56.     To date, no such notice has ever been issued or received.

**E.     Inclusiv collaborates with EPA and selects first cohort of CCIA subrecipients**

57.     On November 19, 2024, Inclusiv opened its pre-qualifications for credit union applications. Inclusiv received 254 pre-qualification submissions from an array of credit unions across more than 40 states and territories in its first pre-qualification round. This was a much greater number of interested credit unions than Inclusiv had originally projected, revealing widespread national demand for this type of funding and support for local communities.

58.     On December 19, 2024, during its weekly call with EPA grant managers, Inclusiv informed EPA of the pre-qualification submissions it had received.

59.     That same day, EPA issued Modification No. 1 to Inclusiv's notice of award, revising EPA's termination rights under the grant agreement. The modified notice of award stated:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the non-compliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination.

The modification did not give EPA any authority to terminate the grant agreement due to a change in agency policy or program priorities.

60.     The modification also revised the notice of award to reflect that, as of September 19, 2024, Citibank, N.A. was designated as the financial agent responsible for holding Inclusiv's funds.

61.     On December 26, 2024, after conducting a thoughtful review of all pre-qualification submissions, Inclusiv sent pre-qualification confirmation notices to all selected credit unions.

62.     On January 6, 2025, Inclusiv opened its first application round to pre-qualified credit unions. Inclusiv informed EPA grants managers of the same during their weekly call on January 7, 2025.

63.     On their January 16, 2025 weekly call, Inclusiv informed EPA that the first application round was closing, and that review of all applications would begin the following day.

64.     On their January 23, 2025 weekly call, Inclusiv informed EPA that it had begun its independent application review process.

65.     On their January 30, 2025 weekly call, Inclusiv informed EPA that it was finalizing its application review.

66.     On their February 6, 2025 weekly call, Inclusiv informed EPA that it was finalizing a preliminary list of subrecipients and would provide the same to EPA.

67.     On February 12, 2025, Inclusiv provided written notice to EPA grants managers and EPA's Office of the GGRF, stating Inclusiv had selected its first group of subrecipients. Inclusiv then provided a written notice in connection with the first

group of subrecipients. These notices included the subrecipients' names, locations, and award amounts.

68.     On February 14, 2025, Inclusiv provided written notice to EPA grants managers and EPA's Office of the GGRF, stating Inclusiv had selected the second group of subrecipients. Inclusiv provided the same written notice it had to the first group to the second group of subrecipients.

69.     Inclusiv chose an initial round of 108 subrecipient credit unions in 27 states and Puerto Rico, awarding them $651 million in committed subrecipient funds. Inclusiv provided subaward notice letters to 64 subrecipients on February 12, 2025, and to 44 subrecipients on February 14, 2025. Once those subaward agreements were finalized, the 108 subrecipients would leverage CCIA funding to bring affordable clean energy financing, financial security, and good jobs to the homeowners, small business owners, and communities they serve.

**F.     EPA Freezes GGRF funds, and Citibank refuses to release them**

70.     From the time of Inclusiv's award through the present, Inclusiv has kept EPA apprised of its CCIA program implementation efforts. Inclusiv maintained full communications and transparency with EPA, including through attendance at EPA-sponsored trainings and workshops; frequent communications with EPA staff; and weekly calls with EPA grants managers, during which Inclusiv updated EPA as to developments in the subaward process.

71.     On February 12, 2025—the same day Inclusiv provided written notice to EPA about its first group of 108 chosen subrecipients and sent award notice letters

to 64 of those subrecipients—EPA Administrator Zeldin publicly announced that EPA intended to claw back all GGRF grants and "return the entire fund balance to the U.S. Treasury."

72.    On February 13, 2025, EPA issued a press release reiterating EPA Administrator Zeldin's February 12, 2025 comments. EPA Administrator Zeldin further stated in posts on the social media platform X that the GGRF is "criminal," and declared that he "would not rest until these hard-earned taxpayer dollars are returned to the U.S. Treasury."

73.    On February 14, 2025, Inclusiv sent award notice letters to the other 44 subrecipients.

74.    Since mid-February 2025, Inclusiv has been unable to access any of the GGRF funds held in its accounts by Citibank. Because of that freeze, Inclusiv and its subrecipients—along with the recipients and subrecipients of other GGRF grants— have lost access to their awarded and obligated CCIA funds. While the freeze is in place, neither Inclusiv nor its subrecipients may carry on critical program activities in service of their mission. Still, facing national demand for its GGRF program, Inclusiv has attempted to comply with its commitments to its CCIA subrecipients by continuing to implement its program to the best of its ability.

75.    In a February 13, 2025 email to representatives of both Inclusiv and Citibank, Citibank's Daniel Figoni wrote: "Citi is aware of the public statements made by EPA Administrator Zeldin regarding the Greenhouse Gas Reduction Fund Program. Citi is discussing with the US Department of Treasury and the EPA what

the implications of these statements are for the Program and its continued operation. At the present time, the last update we received is that EPA is intending to issue a communication out to recipients with further guidance."

76.    In a response that same day, Inclusiv's General Counsel wrote: "Though we are also aware of the public statement [by Administrator Zeldin], we are unclear what it means, if anything, and we have to-date only received (re)affirmation to move ahead with our legally obligated funds and approved program workplan."

77.    On February 14, 18, and 19, 2025, Inclusiv checked in with Jesse Rubin of Citibank to inquire about any updates from EPA. Each time, Rubin confirmed that Citibank had not received any updates or guidance.

78.    On February 18, Rubin suggested Inclusiv postpone a webinar scheduled for its 108 grantees, who expected that their Citibank accounts would be opened. Since Citibank had not opened accounts for Inclusiv's subrecipients, Inclusiv was forced to postpone the webinar.

79.    On February 24, 2025, after Inclusiv asked Citibank about logistical details for the rescheduled webinar, Rubin asked, on the same email chain, "Have you received any further correspondence from EPA? Is it possible to put the webinar on hold until you receive further clarity from EPA? The Citi team unfortunately won't be able to join the webinar until more information is provided by EPA."

80.    Inclusiv replied to Rubin's queries by directing Citibank to open accounts for its grantees and seeking clarity as to Citibank's position:

> The messaging we continue to receive from our grant managers at EPA is to move ahead with our approved workplan under our controlling

award agreement (including our ACA with Citi and the T&C with EPA). Are you aware of other direction that you can share with us to better inform our Contracting Phase planning?

We want to continue to work collaboratively, of course, but we also do not fully understand this continued uncertainty and pause. Having already postponed the webinar once, we really need some clarity around if, when, and how Citi is going to be able to proceed. As you know, we now have 108 community lender subawardees eager to complete the Contracting Phase, including moving through the Citi KYC and account opening processes. Without contrary direction from EPA, we have every intention of proceeding as planned and contracted.

To that end and to be clear, is it Citi's position at this time that if Inclusiv, using the existing KYC and account opening materials . . . , presents the webinar on our own and begins directing subawardees to submit KYC materials to Citi, Citi will not process and open those subawardees accounts?

Citibank never responded to Inclusiv's email.

81.    Throughout these exchanges, Inclusiv sought guidance from EPA about the freeze and suspension of GGRF funds, but EPA provided no answer.

82.    Unbeknownst to Inclusiv, EPA was working with the Office of the Deputy Attorney General to stop Citibank from Disbursing GGRF grants. Those efforts included attempts to open a grand jury investigation and resulted in the FBI sending a letter to Citibank "recommending" that GGRF accounts be frozen.

83.    On March 2, 2025, EPA sent a letter to its Inspector General seeking to formally investigate the GGRF program and stating that concurrent investigations by the Department of Justice and Federal Bureau of Investigations were underway. The letter further described GGRF grants as revealing a "pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the

prior administration." The letter additionally claimed that the GGRF grant recipients "lacked basic financial competency."

84.    On March 3, 2025, EPA issued a press release publicizing the March 2 letter. That release included the letter's full text, and once again accused GGRF fund recipients of "financial mismanagement, conflicts of interest, and oversight failures." Neither the March 2 letter nor the March 3 press release explained these accusations, mentioned Inclusiv, or any alleged wrongdoing by Inclusiv.

85.    On March 4, 2025, EPA sent Inclusiv a letter making 35 requests for information regarding Inclusiv's use of its CCIA funds. Inclusiv replied on March 28, 2025 with an 18-page letter describing its historical work to support credit unions; the status of its CCIA program and subrecipients; its communications and shared priorities with EPA; and the internal controls it had implemented "to even further protect against Waste, Fraud, and Abuse of funds." Inclusiv made that letter publicly available on its website, and also provided to EPA hundreds of pages of supporting documents and exhibits.

86.    On March 4, 2025, and again on March 10, 2025, Treasury told Citibank "not to disburse funds from any of the GGRF accounts."

87.    Unaware of EPA's machinations, Inclusiv continued to instruct Citibank to set up accounts for Inclusiv's 108 subrecipient credit unions so that Inclusiv's grant funds could be disbursed. Citibank has stalwartly refused to set up those accounts and has never answered Inclusiv's questions about what it should do.

**G.    EPA purports to terminate the GGRF grants**

88.    On March 11, 2025, EPA sent all GGRF grant recipients, including Inclusiv, letters purporting to terminate their grants. The letters are substantively identical and were all signed by EPA Acting Deputy Administrator W.C. McIntosh. Copies of the letters were sent to Citibank.

89.    That same day, EPA issued a press release announcing the "termination of th[e] grant agreements." The press release stated that EPA was terminating GGRF grants due to "program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the agency's priorities[.]" EPA described the grants as "riddled with self-dealing and wasteful spending."

90.    EPA's letter to Inclusiv rests its termination of GGRF grants on 2 C.F.R. §§ 200.339–340, and the "General Terms and Conditions of EPA award agreements"; the terms and conditions of Inclusiv's grant; and EPA's "inherent authority to reconsider prior determinations."

91.    EPA's letter echoed its press release, stating that EPA's termination was "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  The letter also referenced vague "material deficiencies" that "cannot be remedied by imposing specific conditions"; amorphous "concerns" about "rigorous oversight and accountability"; and a lack of "sufficient protections" against "potential violations of the Constitution."

92.     The letter provides no explanation or evidence in support of any of its allegations. It does not identify any Fraud, Waste, or Abuse committed by Inclusiv. Nor does it explain what oversight concerns purportedly motivated EPA's decision to terminate Inclusiv's grant. In fact, EPA did not even receive the information it had requested regarding Inclusiv's CCIA program until March 28—more than two weeks after it purported to terminate Inclusiv's grant on March 11, and three weeks after it requested that information on March 4.

93.     The letter did not give Inclusiv any procedural right to seek alternative resolutions of EPA's concerns. Nor did it afford Inclusiv an opportunity to challenge its termination under the applicable grant regulations.

94.     The letter stated that EPA would "work to re-obligate lawfully appropriated funds" to other eligible GGRF recipients.

95.     As of the filing of this Complaint, none of the funds legally obligated to Inclusiv by EPA under the GGRF program have been disbursed. Inclusiv has been trying to find a way to access the money in its Citibank grant account, but despite its obligations under the Account Control Agreement, Citibank has not permitted access.

96.     If EPA's termination of the grant is not enjoined, and if that termination is read to be based on noncompliance with applicable law, Inclusiv will be entered into a government-wide database, jeopardizing its ability to receive future grants. *See* 2 C.F.R. §§ 200.340(c), 200.341(b). A record of poor grant performance may also lead to the imposition of burdensome "specific conditions" on future grant awards. *Id.* §§ 200.206(b), 200.208(b).

97. By falsely portraying Inclusiv as an unscrupulous actor and an improper steward of federal funds, EPA's termination letter and public statements jeopardize Inclusiv's relationships with grant recipients, credit unions, and community leaders. EPA's statements will also impair Inclusiv's ability to develop new relationships with subrecipients and subcontractors, who frequently require a record of past experience to ensure the receipt of future grants and avoid the imposition of specific conditions.

98. Many of the communities and stakeholders Inclusiv supports rely on the uninterrupted flow of capital to maintain their lending programs. The stakeholders selected as CCIA subrecipients have mobilized substantial time, money, efforts, and resources to prepare programs that rely on Inclusiv's CCIA funds. Already, Inclusiv's loss of access to those funds has thwarted those stakeholders' designs, imperiling programs that are critical for taxpayers in low- and moderate-income communities. These delays and uncertainties have endangered Inclusiv's business relationships, and jeopardized Inclusiv's fundamental mission.

**H.    Inclusiv seeks collaborative resolution from EPA and Citibank**

99. On March 18, 2025, in response to a request from three NCIF grantees, the U.S. District Court for the District of Columbia issued a temporary restraining order halting the effects of the March 11 letter.

100. In a March 21, 2025 letter to Citibank, counsel for Inclusiv explained that Inclusiv continues to seek access to its funds. Counsel highlighted this Court's March 18 temporary restraining order and noted that the logic of that order applies equally to Inclusiv's CCIA grants. Counsel accordingly asked Citibank to confirm that

it would "maintain the status quo for the GGRF grant funds in Inclusiv's account" and promptly alert counsel "of any efforts to the contrary prior to taking any action in response to such a request."

101.    Citibank has not responded to the March 21, 2025 letter. The only way to ensure that EPA and Citibank will allow Inclusiv to access its own funds, and avoid the various associated harms, is for Inclusiv to file this suit.

102.    Inclusiv maintains a collaborative stance towards its party opponents, and communications are ongoing. As discussed above, on March 28, 2025, Inclusiv responded to EPA's March 4, 2025 letter by providing extensive details and documentation of its program. Inclusiv again requested an opportunity to meet with EPA "to further discuss [its] CCIA program"; to "clarify the misunderstandings [EPA] may have"; and to explain "Inclusiv's key role in advancing financial security of American consumers, homeowners, and businesses."

103.    Inclusiv also continues to make diligent, good-faith efforts to gain clarity and avoid litigation by communicating with EPA and Citibank, seeking commitments to preserve the status quo. As of March 28, 2025, EPA agreed not to retrieve Inclusiv's grant funds from Citibank so long as the temporary restraining order in case 1:25-cv-698 remains in place. That same day, Inclusiv responded to subpoena requests from the United States Attorney's Office in connection with EPA's investigations. Inclusiv hopes for an amicable resolution that will allow all parties to maintain their successful working relationships, and to continue designing and implementing critical programs that serve the needs of American taxpayers.

## COUNT I

### Violation of the Administrative Procedure Act:
### Contrary to the Inflation Reduction Act
### (Against EPA Defendants)

104.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

105.    EPA Defendants have taken final agency action both by directing Citibank to impose a freeze on Inclusiv's accounts and by issuing the March 11, 2025, letter purporting to terminate Inclusiv's GGRF grant.

106.    The Administrative Procedure Act directs courts to set aside agency actions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

107.    The Constitution requires agencies to "follow statutory mandates so long as there is appropriated money available." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). In passing the Inflation Reduction Act, Congress created the GGRF, appropriated $26.9 billion for GGRF grants, and commanded EPA to obligate those funds no later than September 30, 2024. 42 U.S.C. § 7434.

108.    EPA Defendants' action in freezing and purporting to terminate Inclusiv's grant violates the plain terms of the Inflation Reduction Act, which unambiguously directs EPA to distribute and obligate all GGRF funds.

109.    EPA must adhere to the Inflation Reduction Act as Congress enacted it. No regulation, statute, or constitutional provision authorizes EPA to ignore, subvert, or countermand its duty to establish the GGRF and distribute grant funds. Moreover,

EPA Defendants have no authority to claw back already-obligated funds or redistribute funds after the September 30, 2024 statutory deadline.

110.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory authority." 5 U.S.C. §§ 706(2)(A), (C). Since EPA Defendants' actions violate the plain terms of the Inflation Reduction Act, they must be set aside.

111.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

112.    Inclusiv is thus entitled to all relief prayed for, including a declaration under the APA that EPA's conduct violates the Inflation Reduction Act and an injunction against EPA's unlawful actions.

## COUNT II

**Violation of the Administrative Procedure Act:**
**Contrary to the Congressional Budget and Impoundment Control Act**
**(Against EPA Defendants)**

113.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

114.    EPA Defendants have taken final agency action both by directing Citibank to impose a freeze on Inclusiv's accounts and by issuing the March 11, 2025, letter purporting to terminate Inclusiv's GGRF grant.

115. The Administrative Procedure Act directs courts to set aside agency actions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

116. The Congressional Budget and Impoundment Control Act limits the executive's authority to impound lawfully appropriated congressional funds. The Act requires executive agencies to send a "special message" to Congress if they want to rescind funding "for fiscal policy or other reasons," or if they deem funds unnecessary "to carry out the full objectives or scope of the programs for which [they] are provided." 2 U.S.C. § 683(a).

117. A "special message" under the Act must list the amount of the recission, reasons supporting the recission, and a summary of effects that the recission would have on the programs involved. *See City of New Haven v. United States*, 634 F. Supp. 1449, 1452 (D.D.C. 1986).

118. If Congress does not authorize the recission within 45 days of receiving the "special message," the funds must be released as appropriated. 2 U.S.C. § 683(a).

119. EPA Defendants' action in freezing and terminating Inclusiv's grant failed to follow this congressionally mandated process, in violation of the plain terms of the Congressional Budget and Impoundment Control Act.

120. EPA Defendants have stated a desire to return "the entire fund balance to the Treasury." But EPA did not send a qualifying "special message" to Congress concerning its attempted rescission of Inclusiv's grant funds. Nor has Congress voted to authorize such a rescission.

121.    Even if EPA were now to follow the Act's procedures, its attempt would come too late. The Congressional Budget and Impoundment Control Act's recission provisions apply only to an agency's "budget authority," which is its "power provided by federal law to incur financial obligations." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 313 (2020) (cleaned up); 2 U.S.C. § 622(2)(A)(i). They do not apply where an agency has incurred a "financial obligation" by committing those funds to third parties.

122.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory authority." 5 U.S.C. §§ 706(2)(A), (C). Since EPA Defendants' actions violate the plain terms of the Congressional Budget and Impoundment Control Act, they must be set aside.

123.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

124.    Inclusiv is thus entitled to all relief prayed for, including a declaration under the APA that EPA's conduct violates the Congressional Budget and Impoundment Control Act, and an injunction against EPA's unlawful actions.

## COUNT III

### Violation of the Administrative Procedure Act:
### Contrary to the Anti-Deficiency Act
### (Against EPA Defendants)

125.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

126.    EPA Defendants have taken final agency action both by directing Citibank to impose a freeze on Inclusiv's accounts and by issuing the March 11, 2025, letter purporting to terminate Inclusiv's GGRF grant.

127.    The Administrative Procedure Act directs courts to set aside agency actions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

128.    The Anti-Deficiency Act prohibits agencies from apportioning funds to a reserve except as necessary "to provide for contingencies; . . . to achieve savings made possible by or through changes in requirements or greater efficiency of operations; . . . or . . . as specifically provided by law." 31 U.S.C. § 1512(c)(1). The Act also provides criminal sanctions for any agency official who obligates or expends federal funds without legal authorization. 31 U.S.C. §§ 1341(a), 1342, 1517(a).

129.    EPA's funding freeze violates the Anti-Deficiency Act. This attempt to reserve obligated funds was not justified by contingencies; to achieve savings made through changes in requirements; or to enable greater efficiency of agency operations. To the contrary, EPA has offered no explanation at all for this action beyond specious

allegations in EPA's termination letter, which EPA issued weeks after it froze the GGRF grants.

130.    EPA's termination letter violates the Anti-Deficiency Act and is not authorized by law. It contravenes the Inflation Reduction Act's command to establish and implement the GGRF because EPA lacks authority to, as Administrator Zeldin publicly stated, "return the entire [GGRF] fund balance to the U.S. Treasury." The letter also purports to "reobligate" GGRF funds in contravention of the September 30, 2024 statutory deadline.

131.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory authority." 5 U.S.C. §§ 706(2)(A), (C). Since EPA Defendants' actions violate the Anti-Deficiency Act, they must be set aside.

132.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

133.    Inclusiv is thus entitled to all relief prayed for, including a declaration under the APA that EPA's conduct violates the Anti-Deficiency Act, and an injunction against EPA's unlawful actions.

## COUNT IV

### Violation of the Administrative Procedure Act:
### Contrary to EPA regulations
### (Against EPA Defendants)

134.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

135.    EPA Defendants have taken final agency action both by directing Citibank to impose a freeze on Inclusiv's accounts and by issuing the March 11, 2025, letter purporting to terminate Inclusiv's GGRF grant.

136.    The Administrative Procedure Act directs courts to set aside agency actions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C). "[A]n agency is bound by its own regulations," and courts must set aside agency actions that violate those regulations. *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

137.    EPA cited 2 C.F.R. §§ 200.339–200.340 as the "authority" for its March 11, 2025 termination letter.

138.    Section 200.339(c) allows an agency to terminate a grant for noncompliance if (1) "the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award"; and (2) the agency "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339(c).

139.    EPA's termination letter fails to explain how Inclusiv's actions violate federal law; to illustrate the alleged deficiencies in EPA's grant agreement; or to explain why such deficiencies can be remedied.

140.    Section 200.340 permits termination of a grant award (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award" or (2) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. §§ 200.340(a)(1), (4). It requires agencies to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b); *see also id.* § 200.211(c)(1)(v).

141.    EPA has not identified any violation of the terms of Inclusiv's award.

142.    EPA did not reserve the right to terminate Inclusiv's grant due to a shift in program goals or agency priorities, so it cannot terminate the grant on that basis. In fact, EPA has shifted the goalposts, issuing revised General Terms and Conditions applicable to its grants on March 25, 2025. That shift reveals EPA is fully aware that its termination did not comport with established regulations.

143.    Section 200.341 requires any termination letter to "include the reasons for termination," and Section 200.342 instructs that an agency must give grantees "an opportunity to object and provide information challenging" their termination.

144.    EPA's termination letter does not explain its threadbare allegations of deficiency, waste, and oversight concerns; illustrate how Inclusiv violated the grant's terms; or give Inclusiv an opportunity to object.

31

145.    EPA cannot have based its termination letter on material concerns with Inclusiv's CCIA program. EPA issued this letter barely a week after requesting extensive information from Inclusiv regarding its management of its CCIA program. EPA sent Inclusiv its requests on March 4, 2025; EPA sent its termination letter on March 11, 2025; and Inclusiv gave EPA the requested information on March 28, 2025. This timing reveals that EPA's concerns regarding fraud, waste, abuse, or mismanagement are entirely illusory.

146.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory authority." 5 U.S.C. §§ 706(2)(A), (C). Since EPA Defendants' actions violate EPA's regulations governing grant administration, they must be set aside.

147.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

148.    Inclusiv is thus entitled to all relief prayed for, including a declaration under the APA that EPA's conduct violates its own regulations and an injunction against EPA's unlawful actions.

## COUNT V

### Violation of the Administrative Procedure Act:
### Arbitrary and capricious agency action
### (Against EPA Defendants)

149.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

150.    EPA Defendants have taken final agency action both by directing Citibank to impose a freeze on Inclusiv's accounts and by issuing the March 11, 2025, letter purporting to terminate Inclusiv's GGRF grant.

151.    The Administrative Procedure Act directs courts to set aside agency actions that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency fails to adequately explain its decision or gives an explanation that does not match the evidence, *Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019), particularly when its prior position has "engendered serious reliance interests," *USTA v. FCC*, 825 F.3d 674, 708 (D.C. Cir. 2016).

152.    EPA's actions against the GGRF program mark a stark departure from its decision to award GGRF grants less than one year prior, and jeopardize the serious reliance interests incurred by Inclusiv and its CCIA subrecipients.

153.    EPA's funding freeze is arbitrary and capricious. EPA did not offer any contemporaneous explanation for that action.

154.    EPA's termination letter is arbitrary and capricious. It offers nothing more than vague allusions to "fraud, waste, and abuse" to justify its action, and says nothing specific regarding how Inclusiv might be guilty of such conduct.

33

155.    The circumstances of the termination letter further indicate arbitrary and capricious action. EPA announced a "comprehensive review" of the $27 billion GGRF program on March 2, 2025, by sending a letter to the Inspector General's office. Two days later, on March 4, 2025, EPA sent Inclusiv a request for extensive details regarding its CCIA program. Barely a week later, and before Inclusiv responded to EPA's request for information, EPA sent termination letters to every grant recipient, citing unspecified "material deficiencies."

156.    On its face, the nine-day turnaround from investigation to termination is impossible, indicating EPA's justification of "comprehensive review" is pretextual, and Inclusiv's grant termination was arbitrary. EPA has since admitted that those investigations are ongoing. Furthermore, as of March 28, 2025, Inclusiv has provided EPA with an 18-page letter detailing its GGRF program status, and responding to EPA's 35 targeted requests for materials and information. Inclusiv attached hundreds of pages of such records. This timing reveals that EPA's concerns regarding fraud, waste, abuse, or mismanagement are entirely illusory.

157.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

158.    Inclusiv is thus entitled to all relief prayed for, including a declaration under the APA that EPA's actions are arbitrary and capricious, and an injunction setting aside EPA's unlawful actions.

## COUNT VI

### Violation of the United States Constitution:
### Separation of Powers (Legislative Vesting Clause)
### (Against EPA Defendants)

159.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

160.    The Constitution vests in Congress the exclusive power to legislate. U.S. Const. art. I § 1. Federal grant programs stem from "statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985). No provision of the Constitution authorizes the Executive Branch to amend or repeal statutes, including appropriations approved by law. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

161.    Congress exercised its exclusive legislative powers when it enacted the Inflation Reduction Act, created the GGRF, appropriated funds, and directed EPA to obligate those funds. 42 U.S.C. § 7434. EPA has no power to unilaterally terminate the GGRF program and "return the entire fund balance to the U.S. Treasury" due to mere "misalignment with the Agency's priorities" and objections to the "process for awarding and overseeing execution of" GGRF grant agreements.

162.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

163.    Inclusiv is thus entitled to all relief prayed for, including a declaration the freeze and termination of Inclusiv's grant are unconstitutional, and an injunction setting aside EPA's unlawful actions.

## COUNT VII

### Violation of the United States Constitution:
### Separation of Powers (Spending and Appropriations)
### (Against EPA Defendants)

164.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

165.    The Constitution grants Congress the exclusive power to spend, U.S. Const. art. I § 8, cl. 1, and to appropriate funds, U.S. Const. art. I § 9, cl. 7. This power over the purse is exclusive to Congress, and the Constitution forbids its exercise to the other branches. *OPM v. Richmond*, 496 U.S. 414, 427–28 (1990) ("[The Appropriations Clause] is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.").

166.    Congress exercised its power over the purse when it appropriated funds to create the GGRF program in the Inflation Reduction Act and then directed EPA to obligate those funds via competitive grants, in accordance with statutory criteria. *See* 42 U.S.C. § 7434; *Bennett*, 470 U.S. at 669. EPA initially followed that congressional mandate by duly awarding Inclusiv a prime CCIA award through a competitive grant application process.

167.    EPA has since unlawfully refused to comply with that congressional mandate, purporting to terminate the GGRF grants due to "misalignment with the Agency's priorities" and vague objections to the "process for awarding and overseeing execution of" the grant agreements.

168.    EPA's "unilateral" attempt to refuse to spend GGRF funds frustrates congressional directives and violates the separation of powers. *See Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.) (explaining that even when the executive "has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," he "does not have unilateral authority to refuse to spend the funds").

169.    By withholding and terminating congressionally appropriated grants, EPA violated the Spending Clause and the Appropriations Clause.

170.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

171.    Inclusiv is thus entitled to all relief prayed for, including a declaration the freeze and termination of Inclusiv's grant are unconstitutional, and an injunction setting aside EPA's unlawful actions.

## COUNT VIII

### Violation of the United States Constitution:
### Separation of Powers (Take Care Clause)
### (Against EPA Defendants)

172.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

173.    The Constitution requires the executive to "take care that the laws be faithfully executed." U.S. Const. art. II § 3, cl. 3. The executive's refusal to enforce laws enacted by Congress violates the Take Care Clause. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause").

174.    Congress appropriated funds to create the GGRF program in the Inflation Reduction Act. *See* 42 U.S.C. § 7434. The Act expressly directed EPA to obligate those appropriated funds via competitive grants, using statutory criteria.

175.    EPA has unlawfully refused to do so, instead purporting to terminate the grants due to "misalignment with the Agency's priorities" and objections to the "process for awarding and overseeing execution of" the grant agreements. By refusing to enforce the law as written by Congress, EPA has abdicated the executive's constitutional duties under the Take Care Clause.

176.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other

things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

177.    Inclusiv is thus entitled to all relief prayed for, including a declaration the freeze and termination of Inclusiv's grant are unconstitutional, and an injunction setting aside EPA's unlawful actions.

## COUNT IX

### Violation of the United States Constitution:
### Deprivation of Due Process (Fifth Amendment)
### (Against EPA Defendants)

178.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

179.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. V. At minimum, that Clause prohibits a unilateral seizure of property without notice or opportunity to be heard. *See N. Ga. Finishing v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975).

180.    EPA awarded GGRF grant funds to Inclusiv on August 8, 2024, as memorialized in Inclusiv's notice of award and grant agreement. The United States Treasury deposited those funds into Inclusiv's Citibank Account in accordance with 12 U.S.C. § 265 and the Account Control Agreement.

181.    EPA instructed Citibank to not disburse funds from any GGRF account.

182.    EPA unlawfully purported to terminate Inclusiv's grant without giving Inclusiv any process whatsoever. EPA issued its termination letter with no notice to

Inclusiv and no pre-deprivation opportunity to be heard. EPA also failed to provide Inclusiv with its right to seek review of the termination of its grant.

183.    Inclusiv is now unable to access the grant funds in its account, which are legally obligated to Inclusiv.

184.    Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

185.    Inclusiv is thus entitled to all relief prayed for, including a declaration the freeze and termination of Inclusiv's grant are unconstitutional, and an injunction setting aside EPA's unlawful actions.

## COUNT X

### *Ultra vires* actions in excess of Constitutional and statutory authority
### (Against EPA Defendants)

186.    Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

187.    Courts have equitable power to enjoin government action that violates federal law or exceeds statutory authorization. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

188.    As explained in Counts I–IX, *supra*, EPA Defendants have violated the Administrative Procedure Act, the Inflation Reduction Act, the Congressional Budget and Impoundment Control Act, and the Anti-Deficiency Act by withholding obligated funds in contravention of these plain congressional mandates.

189.   Further, the Constitution vests all legislative and spending power in Congress and requires the executive to faithfully execute congressional commands. EPA's actions fall outside any constitutional authority granted to it and infringe upon exclusive Congressional powers.

190.   EPA Defendants' actions thus fall outside the bounds of any statutory or constitutional authority and are *ultra vires*.

191.   Inclusiv lacks any adequate remedy at law. Should EPA's unlawful acts be allowed to stand, Inclusiv faces irreparable harm in the form of, among other things, lost relationships and goodwill; the permanent deprivation of recovery; and the loss of ongoing projects critical to its organizational mission.

192.   Inclusiv is thus entitled to all relief prayed for, including a declaration that the freeze and termination of Inclusiv's grant are *ultra vires*, and an injunction against EPA's unlawful actions.

## COUNT XI

### Breach of Contract
### (Against Citibank)

193.   Inclusiv realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

194.   Under New York law, breach of contract requires (1) the existence of a contract; (2) performance by plaintiff; (3) failure of defendant to perform; and (4) damages. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). The Account Control Agreement (ACA) is a valid, enforceable contract to which Inclusiv and Citibank are parties, and Inclusiv has fully performed under that contract.

195.     Section 2 of the ACA provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds."

196.     Section 6(a) of the ACA provides that "the duties, responsibilities and obligations of [Citibank] shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial."

197.     Citibank has refused to process Inclusiv's drawdown requests for Inclusiv's administrative costs since at least February 13, 2025.

198.     Inclusiv instructed Citibank to set up bank accounts for Inclusiv's 108 subrecipient credit unions so that Inclusiv's grant funds could be disbursed to those recipients. Citibank has refused to comply with this instruction.

199.     Citibank's refusal breaches Sections 2 and 6 of the ACA because EPA has not issued a Notice of Exclusive Control in connection with Inclusiv's Citi account. EPA has not indicated to Citibank any intention to issue such a notice, and Citibank has not offered any alternative legal grounds for refusing to comply with Inclusiv's lawful disbursement instructions.

200.     Citibank cannot rely on EPA's putative termination of Inclusiv's CCIA grant, which is contrary to law for the reasons described in the preceding counts. Nor has the ACA been terminated or otherwise invalidated.

201.     Citibank's breach has harmed Inclusiv, including by preventing Inclusiv from accessing its own grant funds. Inclusiv prays for the relief stated below.

## COUNT XII

### Conversion
### (Against Citibank)

202.    Inclusiv realleges the preceding paragraphs and incorporates them herein by reference.

203.    Inclusiv has a possessory right to the grant funds in its account, which Citibank manages in a ministerial role pursuant to the ACA.

204.    Pursuant to the ACA, Inclusiv directed Citibank to disburse those funds. Citibank has intentionally refused to disburse those funds to Inclusiv, and instead withholds and exercises dominion over them.

205.    Inclusiv is legally entitled to its funds, but Citibank intends to continue withholding them. Citibank's retention of the funds is an intentional and permanent or substantial interference with Inclusiv's property rights.

206.    The ACA does not permit Citibank to withhold the funds, and Citibank has no legitimate basis for its actions.

207.    Citibank's intentional and wrongful actions have harmed Inclusiv.

208.    Inclusiv is entitled to an injunction against Citibank based on Citibank's wrongful retention and withholding of Inclusiv's funds.

209.    Inclusiv is also entitled to a declaration, pursuant to 28 U.S.C. § 2201, that Citibank's refusal to disburse Inclusiv's funds works a conversion of the funds. Inclusiv prays for the relief stated below.

## COUNT XIII

### Replevin
### (Against Citibank)

210.    Inclusiv realleges the preceding paragraphs and incorporates them herein by reference.

211.    Inclusiv has a possessory right to the grant funds in its account, which Citibank manages in a ministerial role pursuant to the ACA.

212.    Pursuant to the ACA, Inclusiv directed Citibank to disburse those funds. Citibank has intentionally refused to disburse those funds to Inclusiv, and instead withholds and exercises dominion over them.

213.    Citibank's intentional and wrongful actions have harmed Inclusiv.

214.    Inclusiv is entitled to an injunction against Citibank based on Citibank's wrongful retention and withholding of Inclusiv's funds.

215.    Inclusiv is also entitled to a declaration, pursuant to 28 U.S.C. § 2201, that Citibank's refusal to disburse Inclusiv's funds works a conversion of the funds. Inclusiv prays for the relief stated below.

### PRAYER FOR RELIEF

WHEREFORE, Inclusiv seeks judgment in its favor and against Defendants as follows:

1.    Pursuant to 28 U.S.C. § 2201, declaring that EPA's March 11, 2025 Notice of Termination is void and without any effect;

2.     Pursuant to 28 U.S.C. § 2201, declaring that EPA's suspension and termination of Inclusiv's grant award under the Greenhouse Gas Reduction Fund's Clean Communities Investment Accelerator program violates:

a.     The Administrative Procedure Act, where EPA Defendants' actions are arbitrary and capricious, not in accordance with law, and in excess of statutory authority, 5 U.S.C. §§ 706(2)(A), (C), as those actions violate the Inflation Control Act; the Congressional Budget and Impoundment Control Act; the Anti-Deficiency Act; and EPA's regulations codified at 2 C.F.R. §§ 200.339–342;

b.     The Separation of Powers commanded by the U.S. Constitution, as those actions violate the Legislative Vesting Clause, U.S. Const. art. I § 1; the Spending Clause, *id.* art. I § 8, cl. 1; the Appropriations Clause, *id.* art. I § 9, cl. 7; and the Take Care Clause, *id.* art. II § 3, cl. 3;

c.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution, U.S. Const. amend. V; and

d.     All statutory and constitutional authority conferred on EPA such that its actions are *ultra vires*.

3.     Pursuant to 28 U.S.C. § 2201, declaring that Citibank freeze of Inclusiv's accounts, and failure to comply with valid and lawful instructions from Inclusiv directing the disposition of funds and assets in Inclusiv's accounts, is contrary to law, including by declaring that:

45

a.    Citibank has violated its obligations under the Account Control Agreement entered into by Citibank, EPA, and Inclusiv; and

b.    Citibank's refusal to set up accounts for Inclusiv's subrecipients for the disbursement of funds in Inclusiv's prime account violates Inclusiv's legal right of ownership in those funds;

4.    A permanent injunction setting aside EPA's March 11, 2025 termination letter, and enjoining EPA Defendants and others in concert therewith from:

a.    Giving effect to the March 11, 2025 termination letter;

b.    Suspending, terminating, or attempting to suspend or terminate Inclusiv's grant award, except as permitted by governing law;

c.    Interfering with Citibank's contractual obligations to Inclusiv, or otherwise causing Citibank to deny, obstruct, delay, or prevent Inclusiv from accessing its funds as permitted under the terms of the grant award.

5.    A permanent injunction ordering Citibank to comply with its obligations under the ACA, including by:

a.    Barring Citibank from transferring Inclusiv's grant funds to any party other than Inclusiv or its subrecipients except as permitted by the ACA or ordered by this Court; and

b.    Ordering Citibank to comply with its obligations under the ACA, including setting up subrecipient accounts at Inclusiv's request, and following all requests Inclusiv will submit in the future.

6.     Entering judgment for Inclusiv against EPA Defendants and Citibank on all counts of this Complaint; and

7.     Granting such other and further relief as may be just and proper.

Dated: March 31, 2025                    Respectfully submitted,

/s/ Jay C. Johnson
Jay C. Johnson (D.C. Bar No. 487768)
Dismas Locaria (D.C. Bar No. 490096)*
Christopher G. Griesedieck
    (D.C. Bar No. 1028847)**
Lindsay M. Reed (D.C. Bar No. 1736766)*
600 Massachusetts Avenue, N.W.
Washington, DC 20001
Phone: 202-344-4000
Fax: 202-344-8300
jcjohnson@venable.com

Kyle H. Keraga (D.D.C. Bar. No. MD0216)
Evan I. Suval*
Cogan R. S. Rooney*
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Phone: 410-244-7650
Fax: 410-244-7742
khkeraga@venable.com

Emily R. Marcy*
Taylor M. Sorrells*
1850 Towers Crescent Plaza, Suite 400
Tysons, VA 22182
Phone: 703-760-1600
Fax: 703-821-8949

*Counsel for Plaintiff Inclusiv, Inc.*

*\* Motions for pro hac vice admission*
*forthcoming.*
*\*\* Renewal certificate pending.*

47