# Exhibit 1

**Civil Action No. 1:25-cv-00498**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INCLUSIV, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, *et al.,*<br><br>          Defendants. | Civil Action No.<br>1:25-cv-00948 |

<u>**DECLARATION OF NEDA ARABSHAHI**</u>

I, Neda Arabshahi, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1.  I am Executive Vice President of the Inclusiv Center for Resiliency and Clean Energy for Inclusiv, Inc. ("Inclusiv"). My business address is 39 Broadway, Suite 2140, New York, NY 10006-3063.

2.  I am competent to testify concerning matters in this declaration. In my role at Inclusiv, where I have worked since 2020, I led the development and submission of Inclusiv's application to the U.S. Environment Protection Agency's ("EPA") Clean Communities Investment Accelerator ("CCIA") program under the Greenhouse Gas Reduction Fund ("GGRF"). Since EPA's award of the CCIA grant to Inclusiv in 2024, I have led the implementation of Inclusiv's CCIA program as we proudly work toward the critical goal of

bringing lower cost, clean, and efficient energy to at least 900,000 of the most energy cost burdened households and small businesses across the country.

3.  I have dedicated the past 21 years to making it easier for people to have affordable energy; clean air, water, and food; fair wages; and economic independence. I deeply understand how skyrocketing and unpredictable energy prices can mean having to turn the heat off during freezing cold winters and the air conditioning off during deadly hot summers. I have also seen firsthand how dirty, polluting energy sources lead to higher levels of air pollution, and dangerous and expensive medical problems, such as higher rates of childhood asthma, and increased allergies.

4.  I hold two degrees from Yale University, an MBA and a Master of Environmental Science degree, both focused on clean energy. My research at Yale focused on the economic development benefits of renewable energy projects in low-income communities.

5.  In my 21 years of experience in the clean energy and sustainability space, I've served as Chief Operating Officer at two different energy startups, where I helped to create financing and access to clean energy and energy efficiency retrofits for low- and moderate-income building owners. I also led the energy program at a large nonprofit organization, where I partnered with public and private sector members to build commitments to low carbon energy solutions, including developing resilient electricity grids and solar workforce development. I trained multinational corporations in how to build ethics and

sustainability into their practices, and I worked for a global wind turbine manufacturer that built wind power plants across the country.

### B. Inclusiv's History and Background

6.  Inclusiv is a nonprofit organization and a U.S. Department of the Treasury-certified Community Development Financial Institution ("CDFI").

7.  For fifty years, Inclusiv has supported a national network of credit unions, which are member-owned financial cooperatives that are operated by residents of the communities they serve.

8.  Inclusiv provides guidance, training, and investment capital to credit unions, so they are able to strengthen local economies, reach and serve underbanked individuals, promote affordable homeownership opportunities for low-income and first-time homebuyers, support small business enterprises to spur the creation of good jobs, and create access to affordable clean energy loans.

9.  Specifically, while at Inclusiv, I have led our Center for Resiliency and Clean Energy, working in partnership with the University of New Hampshire, to build and scale the nation's first Solar and Clean Energy Lending Training and Technical Assistance Program for community lenders. Since 2020, through our self-paced training courses and 22 instructor-led cohorts, we have trained over 900 individuals from over 400 community-based financial institutions that serve all 50 states, Washington DC, Puerto Rico, the US Virgin Islands and Guam.  This includes 220 credit unions and cooperatives trained.  These lenders have gone on to develop energy efficiency and renewable energy

lending programs designed to reduce energy costs, improve efficiency, and strengthen preparedness and resilience to extreme weather.

### C. Inclusiv's Partnerships with the Federal Government

10. As we stated in our CCIA application, Inclusiv has a strong track record of advancing federal government goals and objectives by leveraging its deep and long-standing relationships within the credit union movement.

11. Years before its CCIA award, Inclusiv developed extensive experience in pairing federal investments from the CDFI Fund with private impact capital. By leveraging CDFI funds to raise private capital, Inclusiv invested a total of $486 million directly into credit unions across the country. This work has allowed credit unions to extend loans to individuals who would otherwise be excluded from the financial mainstream, including first-time homebuyers and small business owners.

12. Inclusiv's work with the federal government in delivering financial products to communities includes several efforts during the first Trump administration, including:

    a. Inclusiv supported the U.S. Department of the Treasury's ("Treasury") Emergency Capital Investment Program ("ECIP"), which was implemented under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  In its ECIP work, Inclusiv assisted credit unions in leveraging federal investments to multiply their impact.  Credit unions that participated in ECIP typically

4

raise $10 in deposits from their community members to fuel local lending for every $1 in federal investments.

b. Inclusiv assisted the U.S. Small Business Administration in enrolling and supporting community development credit unions in the Paycheck Protection Program ("PPP") to deliver capital to small businesses during the COVID-19 pandemic. Through these efforts, Inclusiv facilitated credit unions delivering almost $2 billion in PPP loans to small businesses, with an average loan size of $27,000.

c. Inclusiv teamed up with the University of New Hampshire's Carsey School of Public Policy, with support from the Trump U.S. Department of Energy, to design and deliver the nation's first solar lending training program for community lenders. The community lenders that completed this training program went on to finance thousands of solar projects, making affordable and clean solar power available to nearly 18,000 households.

**D. Inclusiv's CCIA Application**

13. On July 14, 2023, EPA published its Notice of Funding Opportunity ("NOFO") for the CCIA program.

14. The CCIA NOFO offered a $6 billion grant competition "to finance clean energy in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities. . . ." The CCIA competition would "provide grants to 2-7 hub nonprofits that will

provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions." Such "community lenders could include community development financial institutions (including Certified Native CDFIs), credit unions, green banks, housing finance agencies, minority depository institutions, and other types of lenders."

15. Inclusiv meets the CCIA program "eligible recipient" requirements and was therefore to apply. An eligible recipient is defined as an organization that: (a) is a nonprofit; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors.

16. In addition to meeting program eligibility requirements, given Inclusiv's background, including its unique status as a certified CDFI intermediary, decades of experience in providing technical and financial assistance to credit unions, years spent providing training and technical assistance to hundreds of community lenders in how to build clean energy financial products, and decades of experience working with the federal government to deliver tangible

6

economic benefits to  communities across the country, Inclusiv soon deter-mined it would apply for a CCIA grant.

17. Inclusiv dedicated considerable staff time during the three months fol-lowing the NOFO's posting to prepare its CCIA application, which was submit-ted to EPA in October 2023. Our application included a fifty-four-page Project Narrative, a Project Narrative Attachments section containing hundreds of pages of supporting materials, such as 220 Letters of Interest from different credit unions across the country, stating they would plan to seek a subaward from Inclusiv, if Inclusiv received a CCIA award. These 220 credit unions are based in 37 states, the District of Columbia, and Puerto Rico.

18. Inclusiv understands first-hand the ability of credit unions in the U.S. to directly serve individuals and small businesses in every corner of the coun-try. According to the federal government's National Credit Union Administra-tion, as of December 31, 2024, there are 4,455 federally insured credit unions that provide direct banking services to 142.3 million Americans.  These mem-ber-owned financial institutions collectively manage $2.31 trillion in commu-nity-owned assets.  And, as regulated depositories, credit unions can leverage federal resources to increase local investment and economic growth. All of these credit unions may apply to Inclusiv's CCIA program. And Inclusiv is op-erating as a pass-through entity, delivering 90% of our CCIA award directly to credit unions, to help them create direct pathways that empower consumers and small businesses across the country to make their own energy choices to help them lower their energy bills.

19. In addition, to support credit unions so they are positioned to succeed in the CCIA program, Inclusiv is "expanding and scaling existing partnerships, as well as launching new partnerships, with community organizations, such as credit union leagues, green lending financial technology companies, financial coaching platforms, and academic and research institutions." This approach was reinforced in our CCIA application by 67 Letters of Support from national and regional community organizations that indicated their interest in partnering with Inclusiv on its CCIA program.

**E. Inclusiv's CCIA Award and Program Implementation**

20. On August 8, 2024, EPA awarded a CCIA prime grant to Inclusiv in the amount of $1.87 billion dollars. Importantly, 90% of these funds, or $1.683 billion will be directly passed through to credit unions across the country in the form of subawards. And these credit unions will use these grant funds to leverage their own institutional capital to make direct investments in communities across the country.

21. Leading up to the award, Inclusiv worked with EPA to finalize its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

22. As memorialized in Inclusiv's EPA-approved Workplan and Budget, Inclusiv's CCIA program vision was based on hundreds of hours of specific and detailed engagements since 2020 with hundreds of community lenders that

demonstrated interest in creating affordable and equitable clean energy loan products for the communities they serve.

23. These credit unions applied to and completed Inclusiv's Solar and Green Lending Training and Technical Assistance Program that was developed in collaboration with the UNH Carsey School of Public Policy and with support from the DOE under the first Trump administration. After completing these courses, the credit unions had greater knowledge on clean capital financing, which was intended to facilitate efficient financial management practices. As a direct result of Inclusiv's technical support efforts, our network of credit unions reported investing $800 million in clean energy and energy efficiency loans—before Inclusiv was selected for its CCIA prime grant award.

24. Based on this work, these credit unions were well-positioned to leverage CCIA subawards with their own private institutional capital, to expand their existing lending programs and make clean energy financing available and accessible in their communities. The CCIA subawards would provide a significant capital infusion to support these efforts. Inclusiv expects that the up to 400 credit unions receiving Inclusiv's CCIA subawards will leverage $1.496 billion in CCIA Capitalization Funding, to deploy an additional $2.992 billion in private capital, resulting in $4.488 billion in total financial assistance to at least 900,000 CCIA-eligible energy projects—all of which will benefit households and small businesses nationwide. These subrecipients will also receive $187 million in Technical Assistance Subawards to enable them to build, manage, and report on their CCIA programs.

9

25. To date, Inclusiv has committed $651 million in subawards to 108 credit unions across the country to be part of just its first cohort of subrecipients. These credit unions are based in 27 states and Puerto Rico and provide direct banking services to more than 4.9 million Americans. They will leverage their CCIA subawards with their own institutional deposit capital to provide nearly $1.8 billion in new lending capital to homeowners and small businesses. These investments will make clean energy affordable, create jobs, and promote greater financial security within the communities the credit unions serve. The energy savings will allow Americans to reinvest their dollars elsewhere in the U.S. economy.

26. In addition to passing 90% of its CCIA award to credit unions in the form of subawards, Inclusiv will use the remaining 10% allocated to administrative costs and technical assistance services to invest in market-building activities that serve the nation. For example, Inclusiv will continue to expand its Solar and Green Lending Training and Technical Assistance program to train more than a thousand community lenders nationwide so they can leverage their own institutional deposit capital to grow their local clean energy markets. These training resources will be available to community lenders, whether or not they receive CCIA subawards.

27. Inclusiv is ensuring transparency and accountability in its use of CCIA funds in the following ways:

   a. A compliance plan to ensure that every single dollar that Inclusiv receives from CCIA, including the 90% of dollars that are passed

10

through to credit unions, follow the strictest code of federal regulations (CFR) requirements in terms of financial and administrative processes and controls.

b. An accountability plan for credit union subrecipients, which affirmed that all subrecipients would be "regulated, fully insured depositories, subject to rigorous examination by prudential regulators", reviewed to ensure "that [credit union] management and staff act with the highest standards of integrity, fairness and transparency", and monitored by the annual reports, presented by the credit unions to their members and to their regulators, including "reports on financials, products and pricing determinations, internal audits and accountability to member goals."

c. A reporting plan using Inclusiv's proprietary Financial Inclusion Data Analytics Platform (FIDAP) to ensure visibility into each and every loan transaction that a credit union originates using CCIA fund. FIDAP is a software platform designed to ensure that credit unions meet the compliance requirements of federal grant dollars and has, to date, processed millions of loan transactions from credit unions all across the country. All credit unions receiving CCIA subawards are required to use FIDAP to report on their CCIA loan transactions.

d. A plan to satisfy the requirements in 2 C.F.R. § 300.329 by providing quarterly and final reports to the government on

11

subrecipients' ongoing performance under the program, detailed accounting on all grant expenditures, organization financial statements and disclosures, and information on Inclusiv's past performance and reporting compliance in the 80 federal and non-federal financial assistance agreements that it has successfully completed and managed.

e. A Financial Policies and Procedures Plan, which complied with the requirements set forth at 2 C.F.R. § 200.302, specifying "that all Inclusiv personnel comply with Generally Accepted Accounting Principles (GAAP), maintain effective systems of control to safeguard assets and monitor compliance with policies established by management and details the procedures by which the fiscal and accounting departments properly identify the sources and application of **all** funds (from federal awards or not), exhibiting effective control over and accountability for all assets, ensuring they are used only for authorized purposes, creating and monitoring budget-to-actual reporting, and the use of written procedures for Federal payments and the allowability of costs."

## F. Inclusiv's Grant Agreement and Modification

28. On August 8, 2024, EPA's CCIA award to Inclusiv was memorialized in Notice of Award No. 84094301 ("NOA"), which was executed by both EPA and Inclusiv. The NOA set a period of performance from April 1, 2024 to June 30, 2030. The total amount of the award was $1,870,000,000.

29. In the NOA's Project Description, Inclusiv was required to use the awarded funds to "provide funding and technical assistance to community lenders who will in turn finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of the community lenders to draw on that capital to catalyze deployment of projects in communities across the country"—particularly in underserved communities.

30. The NOA acknowledged Inclusiv's extensive experience in this field: "Inclusiv is uniquely positioned as a hub nonprofit to enable this vast network of community lenders to finance clean technology projects in building retrofits, transportation, and distributed energy that support affordability and impact in low-income and disadvantaged communities, in perpetuity."

31. On December 19, 2024, EPA issued Modification No. 1 to the NOA (the "Modification." This Modification, which was issued unilaterally by EPA without incorporating any revisions proposed by Inclusiv, consisted of the following revisions to the initial award document:

      a.  Section III(S)(3), which addresses EPA's termination rights under the Agreement, was modified to state that "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.3339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the non-compliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is

adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."

    b. Section V(A) was revised due to the September 2024 designation of Citibank, N.A. ("Citibank") as a financial agent of the U.S. Specifically, this resulted in the inclusion of several terms related to the deposit accounts to be established by Inclusiv and its subrecipients at Citibank.

32. In follow up to the Modification, Inclusiv worked with EPA to make relevant updates to its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

**G. Inclusiv's Implementation of its CCIA Program**

33. From the time of the award to this day, Inclusiv has worked with EPA to maintain open lines of communication and facilitate EPA's visibility into Inclusiv's activities under its CCIA program. In this effort, Inclusiv and EPA have attended scheduled calls each week so Inclusiv can apprise EPA of any updates to its implementation efforts.

34. On November 19, 2024, Inclusiv opened its pre-qualification form for credit unions. It received an overwhelming response of submissions from more than 250 credit union across the U.S. and in U.S. territories. Inclusiv informed its EPA grant managers during its weekly call on December 19, 2024 that it received 254 pre-qualification submissions from credit unions.

14

35. After a thoughtful review of all 254 applications, on December 26, 2024, Inclusiv sent out pre-qualification confirmation notices to selected credit unions.

36. On January 6, 2025, Inclusiv launched its full application period, with its first application round deadline of January 17, 2025. Inclusiv notified its EPA grants managers of this progress during the weekly calls on January 7 and January 16, 2025.

37. Once the application period had begun, Inclusiv continued to maintain open lines of communication with its EPA grants managers at all stages of the process during weekly calls, *e.g.*:

  a. On January 23, 2025, during a weekly call, Inclusiv alerted EPA that its independent application review process was underway.

  b. On January 30, 2025, during a weekly call, Inclusiv informed EPA that it was finalizing its application review and expected to finalize its scoring.

  c. On February 6, 2025, during a weekly call, Inclusiv told EPA that it was finalizing its preliminary list of subrecipients and that it would provide the full list of first cohort subrecipient credit unions.

38. Inclusiv undertook a diligent application and evaluation process to ultimately choose 108 subrecipient credit unions in 27 states and Puerto Rico to be part of its first cohort, which would use $651 million in CCIA funding to offer homeowners and small businesses affordable clean energy financing,

create jobs, and promote greater financial security within the communities served.

39. On February 12, 2025, Inclusiv chose its first group of 64 subrecipients and on the same date provided written notice to its EPA grants managers and EPA's Office of the Greenhouse Gas Reduction Fund ("OGGRF"). The written notices to EPA provided full breakdowns of all subrecipient credit unions' names, locations, and award amounts.

40. On February 12, 2025, Inclusiv also provided Subaward Notice Letters to the 64 individual subrecipient credit unions in the first group, These Subaward Notice Letters included each subrecipient's award amount and detailed instructions for the forthcoming Contracting Phase.

41. Inclusiv finalized the second group of 44 subrecipients on February 14, 2025, and, again, duly provided written notice to its EPA grants managers and the OGGRF.

42. On February 14, 2025, Inclusiv also provided the Subaward Notice Letters to the second group of 44 subrecipient credit unions.

43. All 108 subrecipient credit unions signed and returned their Subaward Notice Letters, thus committing to the funding and their individual CCIA subrecipient programs.

44. On February 19, 2025, and February 26, 2025, Inclusiv held two Welcome Webinars for all 108 subawardees, and initiated the Contracting Phase to eventually finalize their subaward agreements.

45. This initial cohort of 108 subrecipient credit unions provide direct banking services to more than 4.9 million Americans in 27 states and Puerto Rico, leveraging CCIA funds to invest additional private capital in communities burdened by high energy costs to generate a projected $1.8 billion in new lending capital and allow Americans to reinvest their energy savings elsewhere in the U.S. economy.

46. The CCIA funding will also allow credit unions to expand their affordable loan offerings so that Americans who seek out their loans have the autonomy to select the types of energy upgrades and vehicle upgrades they need most for their households and for their businesses. These may include heating and cooling systems, solar panels, back up battery storage, energy-efficient appliances, energy efficiency home improvements, electric vehicle charging stations, and electric vehicles, ultimately helping U.S. households and small businesses lower their energy costs. This new stream of financing will have a ripple effect in communities across the nation, as energy upgrades are performed and contractors, developers, and manufacturers are employed to carry out the projects.

## H. Account Control Agreement with EPA and Citibank

47. On September 19, 2024, the U.S. Treasury entered into a Financial Agent Agreement with Citibank, which tasked Citibank with responsibility to disburse $20 billion in GGRF funds under EPA's CCIA and National Clean Investment Fund ("NCIF") programs.

48. On November 6, 2024, Inclusiv and EPA entered into an Account Control Agreement with Citibank.

49. As required by the December 19, 2024 Modification, Inclusiv was required to open a deposit account at Citibank, to be used as its operating account for the entire CCIA award. Once the deposit account was established, Inclusiv was required to draw down the entire available EPA award balance from Automated Standard Application for Payments ("ASAP") system and disburse it into the deposit account at Citibank, where it was required to be maintained until the Closeout Agreement went into effect.

50. The Modification also required that Subrecipients open and maintain their own deposit accounts with Citibank to use as their subaward operating accounts for the duration of their subawards.

## I. EPA and Citibank's Freeze on Inclusiv's CCIA Funds

51. Beginning in early February 2025, while EPA was still conducting its regularly scheduled meetings with Inclusiv, the new EPA Administrator, Lee Zeldin, began making various public statements expressing concerns about the GGRF program and awards made by EPA under the Biden administration, which culminated in a February 12 announcement by Zeldin that EOA wanted to claw back all GGRF grants. EPA never expressed these concerns to Inclusiv.

52. Between February and March 2025, all GGRF funds held by Citibank were frozen, and Inclusiv, like recipients and subrecipients across all the GGRF programs, had its access to its awarded and obligated CCIA funds

18

suspended. When Inclusiv sought guidance from EPA on the freeze of its awarded and obligated grant funds, EPA provided no answer.

53. Critically, as part of the Contracting Phase that began on February 19, 2025, Inclusiv and Citibank were to provide co-guidance to Inclusiv's subrecipients on opening their own accounts with Citibank. Citibank has refused to allow any of Inclusiv's 108 subrecipients to open their accounts. Because of this, Inclusiv was forced to temporarily suspend its Contracting Phase on March 6, 2025, which we announced to our 108 subrecipients in writing that day.

54. As of today, none of the funds legally committed to Inclusiv's subrecipients have been disbursed.

**J. EPA's Termination of Inclusiv's CCIA Award**

55. On March 11, 2025, Inclusiv received a letter from EPA purporting to terminate its CCIA award (the "Termination Letter") ("Exhibit 12").

56. The Termination Letter stated that pursuant to EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094301, awarded to Inclusiv, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately."

57. However, this purported Termination Letter did not identify any proven "new information."

19

58. Further, the Termination Letter indicated that the decision to terminate was "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."

59. The Termination Letter did not make any specific allegations of fraud, waste, or abuse by Inclusiv. Nor did it articulate any specific conduct by Inclusiv supporting the termination of its grant. Rather, the Termination Letter cited "material deficiencies" apparently uncovered by a "comprehensive review," as well as its concerns about "rigorous oversight and accountability," and a lack of "sufficient protections" against "potential violations of the Constitution."

60. EPA has not completed a comprehensive review of our CCIA program, nor has it identified specific material deficiencies.

61. In addition, EPA has not specified a single concern identifying specific issues with rigorous oversight and accountability.

62. And it certainly has not been made clear what the lack of sufficient protections against potential violation of the Constitution might be.

63. The Termination Letter stated that it was terminating the grant award "in accordance with" the grant agreement.

64. The Termination Letter did not provide Inclusiv with any procedural right to seek alternatives to or challenge its termination under the applicable

grant regulations. On multiple occasions, Inclusiv has invited the EPA Administrator's Office to discuss Inclusiv and its CCIA program, to no avail.

### K. Harms Suffered by Inclusiv

65. Inclusiv's business model is largely based not only on the membership dues paid by its member credit unions, but also on the goodwill and trust of the members. The widely publicized statements made by EPA and Zeldin disparaging the GGRF and the recipients of its programs as unscrupulous has seriously threatened Inclusiv's relationships with its member credit unions.

66. The termination would also disrupt Inclusiv's established relationships with its 108 subrecipient credit unions, each of which went through a rigorous and lengthy application and review process, along with diverting staff members to attend onboarding and technical trainings, in order to receive CCIA subawards. These wasted efforts have harmed Inclusiv's reputation with these subrecipients and their confidence in Inclusiv, and many are likely to sever their business relationships with Inclusiv as a result.

67. Inclusiv has also fostered decades-long relationships with leaders within low-income and disadvantaged communities, who because of the EPA's false allegations concerning Inclusiv's conduct, will be less likely to continue to work with Inclusiv. The severing of these long-standing relationships will harm Inclusiv's furtherance of its organizational mission of empowering and supporting low-income and disadvantaged communities.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025

_/s/ Neda Arabshahi_

Neda Arabshahi

New York, New York